IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RANDY COPELAND and STACY COPELAND,

        Plaintiffs,

and

GREAT WEST CASUALTY COMPANY,

        Involuntary Plaintiff,

  vs.

NORTH AMERICAN PIPE CORPORATION
and STARR INDEMNITY & LIABILITY CO.,

        Defendants.

OPINION AND
ORDER

17-cv-559-slc

---

This is a civil dispute in which the plaintiffs, Randy and Stacy Copeland, seek damages arising out of plaintiff Randy Copeland's alleged slip and fall at a North American Pipe Corp. ("NAPCO") facility. NAPCO removed the case to this court on July 20, 2017 on grounds of diversity jurisdiction. Dkt. 1. Before the court is plaintiffs' motion to remand this case to state court on the ground that NAPCO's notice of removal was untimely. Dkt. 12. Because I find that NAPCO filed the notice of removal within 30 days after receiving affirmative and unambiguous information from plaintiffs establishing that the jurisdictional threshold was met, I am denying the motion.[1]

BACKGROUND

Plaintiff Randy Copeland and his wife, Stacy Copeland, who are residents of Missouri, initially sued defendants NAPCO and its insurer, Starr Indemnity & Liability Company, in the Circuit Court for Rock County, Wisconsin on February 16, 2017, asserting causes of action for

---

[1] NAPCO has asked for permission to file a sur-reply to respond to new evidence and arguments that plaintiffs raised for the first time in their reply brief. Dkt. 23. That motion is granted. Having raised a new issue on reply, plaintiffs are not prejudiced by this court's consideration of the sur-reply.

negligence and violation of Wisconsin's safe place statute. Plaintiffs alleged that on March 25, 2014, while employed by Schill Corporation, Randy Copeland had slipped on ice and fell while he was delivering a load of bulk, dry lime to NAPCO. Dkt. 2-1, at ¶¶9. Plaintiffs named Great West Casualty Co., Schill Corp.'s workers compensation carrier, as an involuntary plaintiff, alleging that Great West had a right to subrogation or reimbursement of monies it paid for Copeland's[2] "medical and related expenses." *Id*. at ¶3. Although plaintiffs' complaint alleged that Copeland had sustained "severe and permanent injuries" and losses, neither the original nor the amended complaint specified that the amount in controversy exceeded $75,000, the threshold for diversity jurisdiction. 28 U.S.C. § 1332(a). Dkts. 1, 2.

On March 15, 2017, NAPCO served plaintiffs with a request for production of documents and served Copeland with a first set of interrogatories. Dkt. 17-3, 17-1. Plaintiffs served their responses to NAPCO's document requests on June 5, 2017. In response to NAPCO's request for documents summarizing their economic damages, the plaintiffs referred to "attached medical records, medical bills and Itemization of medical bills." Dkt. 17-10. The itemized medical expenses totaled $65,345.67. In response to NAPCO's request for plaintiffs' federal income tax returns, plaintiffs referred to several years of W2 forms and "Exhibit D," which was a document titled "Wage Calculations." Dkt. 17-10, 17-11. The document, for which plaintiffs provided no context or explanation, appears to show a calculation of Copeland's gross pay for the three month period prior to the date of his slip and fall.

In response to NAPCO's request for "All documents the plaintiffs have sent or received from Great West Casualty Company relating to any claim related to the Incident or the injuries

---

[2] In this opinion, I use "Copeland" to refer to plaintiff Randy Copeland.

Copeland allegedly sustained as a result of the Incident," plaintiffs attached a document titled "Stipulation for Compromise Settlement." Dkt. 21-1. That document is a stipulation between Copeland, his employer and Great West Casualty Company. The agreement stated that Schill and Great West had paid $70,753.37 for Copeland's medical bills and $21,867 as compensation for 32 2/7 weeks of temporary disability and that the parties had settled their dispute about Copeland's alleged permanent disability and future medical expenses for $53,085. Dkt. 21-2, Exh. A, attached to Aff. of Atty. Stachowiak.

Copeland did not serve NAPCO with his responses to the interrogatories until June 21, 2017. Answering Interrogatory No. 1, which asked him to disclose the categories and amounts of his economic damages, Copeland stated, in part:

> Plaintiff, Randy Copeland may be making claim for the following: Past Medical Expenses, Future Medical Expenses, Past Wage Loss, Future Loss of Earning Capacity, Wage Loss, Past Pain, Suffering and Disability and Future Pain, Suffering and Disability. Attached to the corresponding Request for Production of Documents is a list of past medical expenses, attached as Exhibit A. In addition, the plaintiff was off work for 32 2/7 weeks, and that is itemized in exhibit D.

On July 20, 2017, NAPCO removed this case to federal court, asserting federal jurisdiction under the diversity statute, 28 U.S.C. § 1332. Dkt. 1. Plaintiffs then filed a timely motion to remand, asserting that defendant's notice of removal was untimely.[3] Dkt. 12.

## DISCUSSION

Ordinarily, a defendant has 30 days from receipt of the complaint to file a notice of removal. 28 U.S.C. § 1446(b)(1). However, when the basis for removal is not revealed on the

---

[3] Plaintiffs agree that diversity is present and that the amount in controversy threshold is met.

face of the complaint, the defendant may remove the case within 30 days of receiving "a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." § 1446(b)(3). Plaintiffs argue that the removal was untimely because NAPCO could have ascertained that the jurisdictional threshold was met from the documents they received from plaintiffs on June 5, 2017, if not from the face of the complaint. NAPCO disagrees, arguing that the 30-day clock was not triggered until it received Copeland's June 21, 2017 responses to the interrogatories, in which Copeland first made clear what damages he was seeking in this lawsuit.

I begin with plaintiffs' fallback position regarding the face of the complaint. In their initial brief, plaintiffs cite to *Freeland v. Wal-Mart Stores East, LP*, 2010 WL 1981642 (W.D. Wis. 2010), in which this court joined other courts from this circuit in finding that the 30-day period was triggered when removal was ascertainable "from a reasonable and commonsense reading of the complaint" or when the initial pleading contained "conspicuous clues" that removal was a likely possibility. *Id*. at *2 (citations omitted). As plaintiffs appear to recognize in their reply brief, however, *Freeland* and the authorities cited therein are no longer good law.

In *Walker v. Trailer Transit, Inc.*, 727 F.3d 819, 825 (7th Cir. 2013), the Court of Appeals for the Seventh Circuit resolved an intra-circuit split concerning the specificity required to trigger the 30-day clock under § 1446(b)(3), rejecting the "reasonable and commonsense" approach adopted in *Freeland*. Instead, it joined the Second, Fourth, Fifth, Eighth, Ninth and Tenth Circuits in finding that the 30-day clock under § 1446(b)(3) "is triggered *only* by the defendant's receipt of a pleading or other litigation paper facially revealing that the grounds for removal are present." *Id*. at 823-24 (emphasis in original). This "bright-line rule," explained the court,

"promotes clarity and ease of administration for the courts, discourages evasive or ambiguous statements by plaintiffs in their pleadings and other litigation papers, and reduces guesswork and wasteful protective removals by defendants." *Id*. at 824.

Importantly, the court made clear that it doesn't matter whether the defendant has a subjective basis for thinking the jurisdictional amount is met. "The moment a case becomes removable and the moment the 30-day removal clock begins to run 'are not two sides of the same coin.'" *Id.* (quoting *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1141 n.3 (9th Cir. 2013)). A review of the facts in *Walker* help to illustrate this point:

Walker filed a class action complaint in Indiana state court, alleging that defendant violated its lease agreements with him and hundreds of other truckers by charging certain add-on fees that were not intended to reimburse defendant. *Id*. at 821. Plaintiffs sought damages calculated as a percentage of the defendant's "profits" from the fees, but their complaint did not specify any damages amount. Later, in response to a request for admissions, the plaintiffs modified their damages theory to seek a percentage of the fees in their entirety. Based on an estimate from one of its executives, the defendant determined that under the plaintiffs' revised theory, the damages were likely to exceed $5 million, which met the jurisdictional threshold under CAFA. 28 U.S.C. § 1332(d)(2), (d)(5)(B). Thus, it removed the case.

The plaintiffs objected, arguing that the defendant should have been able to ascertain much earlier than it did that the damages would exceed $5 million. Applying its new bright-line rule, the court swiftly rejected plaintiffs' argument:

> The earliest possible trigger for the removal clock was Walker's response to Trailer Transit's requests for admission seeking formal clarification of the theory of damages. In that response Walker confirmed that the class was indeed seeking damages based on a

5

percentage of the total disputed fees. Even that document, however, did not affirmatively specify a damages figure under the class's new theory. So the removal clock never actually started to run. Although Trailer Transit filed its notice of removal within 30 days of receiving that response, the removal was not based on Walker's response to the requests for admission alone; it took Walker's admission *and* an estimate from a Trailer Transit executive to show that the jurisdictional limits were met. Removal was not untimely, and the district court properly denied the motion to remand.

*Id*. at 825–26 (emphasis in original).

Thus, under *Walker*, even if a defendant has received enough information from which to conclude—on its own—that the jurisdictional threshold is met, the 30-day removal clock is not triggered until the *plaintiff* affirmatively represents that he is seeking such an amount. In other words,

> the ball is in plaintiffs' court when it comes to commencing the 30-day removal period; if plaintiffs want to trigger it, they can easily do so by providing defendants a clear written statement that they are seeking damages in excess of the jurisdictional minimum.

*Aken v. Polaris Indus., Inc.*, 2016 WL 1384826, at *2 (W.D. Wis. Apr. 7, 2016). *See also Romulus v. CVS Pharmacy, Inc.*, 770 F.3d 67, 79-80 (1st Cir. 2014) (finding that the clock had not begun even where the defendant could have ascertained the amount in controversy by applying information in its possession to the allegations in the complaint); *Mumfrey v. CVS Pharm., Inc.*, 719 F.3d 392, 399 (5th Cir. 2013) (rejecting the plaintiff's argument that the removal clock started when "he pleaded for lost wages and CVS, as his employer, knew his salary"); *Kuxhausen v. BMW Financial Services NA LLC*, 707 F.3d 1136, 1141 (9th Cir. 2013)(rejecting the plaintiff's argument that the defendant "should have consulted its business records" to calculate the amount in controversy based on the allegations in the complaint); *Moltner v. Starbucks Coffee Co.*,

624 F.3d 34, 37–38 (2d Cir. 2010) ("Requiring a defendant to read the complaint and guess the amount of damages that the plaintiff seeks will create uncertainty and risks increasing the time and money spent on litigation.").

In this case, it is undisputed that the complaint did not disclose the amount of monetary damages sought. The only question is whether NAPCO received any post-complaint information from plaintiffs earlier than June 21, 2017 that "affirmatively and unambiguously specifie[d] a damages amount sufficient to satisfy the federal jurisdictional minimums." *Id*. at 825.

In their initial brief, plaintiffs pointed to two documents that they produced on June 5, 2017 that they say triggered the 30-day clock: 1) Copeland's itemization of medical expenses; and 2) the "Wage Calculations" document. These documents fail to meet *Walker*'s bright-line test. The itemization of medical expenses totals $65,345.67, which is less than the jurisdictional minimum. The unexplained wage calculation document is too ambiguous: as NAPCO points out, there is nothing on the document that makes clear that Copeland was seeking lost wages or the amount he was seeking. The document shows Copeland's weekly earnings for the three months *prior* to the date of the incident at issue. It doesn't indicate that Copeland lost any wages or missed any work as a result of his fall and Copeland did not produce the document in response to NAPCO's request for documents summarizing the plaintiffs' economic damages. Accordingly, even if the wage calculation document is considered in conjunction with the itemized medical expenses, they fail to affirmatively and unambiguously notify NAPCO that plaintiffs were seeking damages in an amount that met or exceeded $75,000.

In their reply brief, plaintiffs point to a *third* document that they produced on June 5, 2017 that they say resolves any ambiguity: the "Stipulation for Compromise Settlement"

7

between Copeland, his employer and Great West Casualty. This document shows that Great West paid $70,753.37 for Randy Copeland's medical bills, $21,867 as compensation for 32 2/7 weeks of temporary disability and agreed to a lump sum settlement of $53,085 for alleged permanent disability and future medical expenses. Plaintiffs point out that Great West is an involuntary plaintiff with a subrogation claim and therefore the stipulation between Great West and plaintiff establishes the amount in controversy.

Again, however, plaintiffs miss the point of *Walker*. It is not enough that defendants could have or should have been able to discern from the documents produced that Copeland had damages in excess of $75,000. The *Walker* inquiry focuses on the actions taken by the plaintiffs, and it requires that they *affirmatively* specify a damages figure. The Stipulation for Compromise Settlement was produced in response to a document request asking for documents sent to or received from Great West relating to Copeland's accident and injuries, not a request for documents supporting the plaintiffs' damages. Although NAPCO plainly could have *inferred* from the Stipulation that plaintiffs likely were going to be seeking damages in excess of $75,000, *Walker* demands "a specific, unequivocal statement from the plaintiff regarding the damages sought." *Walker*, 727 F.3d at 824. The Stipulation for Compromise Settlement lacks this clarity.

In sum, even though the defendants arguably could have inferred from the various documents plaintiffs produced on June 5 that plaintiffs were going to seek more than $75,000 in damages, none of those documents explicitly specified the amount of damages plaintiffs were seeking in this lawsuit. It was not until June 21, 2017—-when Copeland responded to the

8

interrogatories—that NAPCO received a paper from plaintiffs that revealed on its face that the jurisdictional threshold was met. NAPCO's notice of removal, filed 29 days later, was timely.

ORDER

IT IS ORDERED that plaintiffs' motion to remand this case to state court, dkt. 12, is DENIED.

Entered this 24th day of January, 2018.

BY THE COURT:

/s/
_____
STEPHEN L. CROCKER
Magistrate Judge